UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES of AMERICA        )        12-CR-30316
                                )        13-CR-30273
                                )
            Plaintiffs,         )
                                )
        Vs.                     )        East St. Louis, Illinois
                                )        January 31, 2014
DAVID M. THOMPSON,              )
                                )
            Defendants,         )

            TRANSCRIPT OF DISPOSITION (Redacted),
        BEFORE THE HONORABLE MICHAEL J. REAGAN,
                UNITED STATES DISTRICT JUDGE.


APPEARANCES:

For the Plaintiffs:        Assistant U. S. Attorney
                           By:  Monica Stump
                           Nine Executive Drive
                           Fairview Heights, Illinois  62298

For the Defendants:        Vogt & Howard
                           By:  Eugene Howard
                           906 Olive
                           St. Louis, Missouri  63101

Court Reporter:            Barbara Kniepmann
                           750 Missouri Avenue
                           East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.

1       (Whereupon the following proceedings were held in open

2   Court.)

3           THE COURT:  United States of America against David

4   Michael Thompson is set for sentencing today.  There are two

5   cases, 13-CR-30273 is what I will refer to as the Ohio case

6   and 13-CR-30316 I'll refer to as the Illinois case.

7           Miss Stump is here for the United States.  Good

8   morning.

9           MS. STUMP:  Good morning, Your Honor.

10          THE COURT:  Mr. Howard is here for the defendant.

11  Good morning.

12          MR. HOWARD:  Good morning, Your Honor.

13          THE COURT:  And Mr. Thompson, good morning.

14          MR. THOMPSON:  Good morning, Your Honor.

15          THE COURT:  The operative Presentence Report in this

16  case is at Document 15 in our electronic filing system in case

17  -- actually the same document filed in both cases.  It was

18  disclosed December 27th of 2013 and revised January 23rd of

19  2014.

20          In this case, in the Illinois case, Mr. Thompson pled

21  guilty to a single count of transporting child pornography,

22  and in the Ohio case he pled guilty to a single count, and

23  that is Count 4, of traveling to engage in illicit sexual

24  conduct.

25          Just by way of history in the Illinois case, on

1    November 16th of 2012 a grand jury sitting here in the

2    Southern District of Illinois returned a one count Indictment

3    which charged that on or about October 23rd of 2012 in Madison

4    County, Illinois, which is in the Southern District of

5    Illinois, David Michael Thompson used a means and facility of

6    interstate and foreign commerce, namely an I-phone and motor

7    vehicle, to knowingly transport child pornography, that is

8    visual depictions, of an actual minor engaging in sexually

9    explicit conduct as defined in 18, United States Code, Section

10   2256(a).

11         Additionally in that case the Government seeks

12   forfeiture of certain property associated with that offense

13   including the I-phone and the white Honda Civic.  On October

14   18th of 2013, absent a plea agreement, Mr. Thompson pled

15   guilty to this particular charge in the Illinois case.

16         In the Ohio case, 13-CR-30273, a grand jury on

17   January 16 of 2013 returned a four count Indictment.  The

18   operative count for our purposes is Count 4 as part of plea

19   negotiations in this case.  If the Court accepts the plea

20   agreement, Counts 1 through 3 will be dismissed with prejudice

21   and Count 4 will stand and that is that on or about October 24

22   of 2012, defendant knowingly traveled in interstate commerce

23   for the purpose of engaging in illicit sexual conduct as

24   defined in 18, U.S.C. Section 2423(f).  Additionally there is

25   a forfeiture count as to the Ohio case.

1    On November 20 of 2013 in the Ohio case in Ohio,

2  pursuant to the written plea agreement and Stipulation of

3  Facts, the defendant pled guilty to Count 4 and agreed to

4  sentencing pursuant to Rule 20 of the Federal Rules of

5  Criminal Procedure that I could sentence him here by way of

6  transfer in the Southern District of Illinois.  As part of

7  that plea agreement in the Ohio case, the parties agreed that

8  an appropriate sentence for the defendant is a term of

9  imprisonment of 180 months under Rule 11(c)(1)(C) of the

10  Federal Rules of Criminal Procedure with the term of

11  supervised release left to the discretion of the Court and the

12  parties able to argue regarding the appropriate language of

13  the supervised release.  Further as part of the plea agreement

14  in the Ohio case, the parties stipulated any sentence imposed

15  in this case in Ohio would run concurrently with the Illinois

16  case.

17    Under Rule 11(c)(1)(C), the parties present a

18  proposed plea agreement to the parties whereby they agree on

19  the term of incarceration.  I have the discretion to either

20  accept that plea agreement and that sentence or reject it.  I

21  have no authority or discretion to depart upward or downward.

22  My discretion is limited to either accepting the 180 months or

23  rejecting it.  If I accept it, that would be the sentence.  If

24  I reject it under the terms of the plea agreement in this

25  case, the defendant would be permitted to withdraw his guilty

1  plea, the Ohio case would be returned back to Ohio for trial

2  and the Illinois case would stay here for trial.

3      So with that procedural background, I would note that

4  at document 13 the defendant filed objections to the

5  Presentence Report relating to paragraph 37 as well as

6  paragraph 42.  The Government responded at document 51, and I

7  am referring to documents in the 273 case.  Probation

8  responded and the defendant filed a Sentencing Memorandum in

9  the Illinois case at document 54 that applies to both cases.

10 Mr. Howard?

11      MR. HOWARD:  Your Honor, at this time I would like to

12 advise the Court on behalf of Mr. Thompson that he wishes to

13 withdraw the two objections that he previously filed to the

14 Presentence Investigation Report.

15      THE COURT:  Okay.  Well, I can understand that as

16 part of 11(c)(1)(C).  I wish you would have told me that about

17 two days ago so I wouldn't have spent about 14 hours

18 researching it, which I have done.

19      MR. HOWARD:  Your Honor, I have to admit, I

20 apologize.  The determination really wasn't made until I met

21 with him just prior, this morning prior to today.

22      THE COURT:  Sure.  I mean the fact is my ruling at

23 the end of the day to accept or reject the plea agreement

24 wouldn't rely on that ruling anyway, right?

25      MR. HOWARD:  No, I don't believe it would.

1          THE COURT:  If the objections were well taken, he

2    would have a substantially lower offense level and potential

3    guideline sentence, but you have all agreed to the 180 months,

4    so at the end of the day it doesn't matter.

5          MS. STUMP:  We would agree to the extent it applies

6    to the Ohio case for purposes of this hearing.  If I may, I'll

7    refer to the Ohio case as 13-CR-30273.  As you mentioned, it

8    is the Government's position that in the case originating out

9    of this District, case number 12-CR-30316, United States has

10   no plea agreement and no agreement as to sentence.  It is our

11   position that we're free to argue for whatever sentence in

12   that case that the United States deems reasonable.  However,

13   we would agree that the sentence for the Ohio case would be

14   the 15 years or 180 months should the Court accept the plea

15   agreement.

16         THE COURT:  Okay.  But as I understand, and this is

17   in an unusual posture because we have an 11(c)(1)(C) agreement

18   in the Ohio case and nothing in Illinois, but the Ohio case

19   supposes that I am going to impose the 180 months in the

20   Illinois case concurrently, does it not?

21         MS. STUMP:  That is not my reading of the plea

22   agreement, no.

23         MR. HOWARD:  My understanding is the sentence would

24   be run concurrent to the sentence imposed in this case,

25   however, we have not come to an agreement as to --

1          THE COURT:  The Illinois case?

2          MR. HOWARD:  The Illinois case and what is the

3    appropriate sentence.

4          THE COURT:  Okay.  When I took the plea in this case

5    I know I advised the defendant of the potential statutory

6    penalties in both cases, including Illinois, which is minimum

7    of five years, maximum of 20 years, and Ohio, which is a

8    sentence of up to 30 years of imprisonment.

9          So by way of preview, is the Government going to ask

10   -- What sentence are you going to request in the Illinois

11   case?

12         MS. STUMP:  Your Honor, the Government would be

13   asking for sentence of 210 months with other factors included

14   in that which I would like to argue for and we would ask for

15   that time to run concurrent with the 180 months out of the

16   Ohio case.

17         THE COURT:  Okay.  So I understand that to the extent

18   you have withdrawn your objections, the Government believes

19   those calculation by probation are appropriate because they do

20   give us an offense level that is consistent with the request

21   of the Government anyway in terms of the sentence.

22         MS. STUMP:  Yes, Your Honor.

23         THE COURT:  Okay.  Will there be testimony this

24   morning?  From the paperwork, it looked like there was going

25   to be.

1    MS. STUMP:  Your Honor, I believe with the withdrawal

2 of the objections and acceptance of the PSR that the United

3 States could proceed based on the information in the PSR and

4 we would just proceed to argument.

5    THE COURT:  Okay.  Let me then have colloquy briefly

6 with the defendant.

7    Mr. Thompson, I have your Presentence Investigation

8 Report in my hand.  It is the same report filed in both cases.

9 It is a total of 17 pages and 102 paragraphs in length.  Have

10 you gone over the report in detail with your attorney?

11    MR. THOMPSON:  Yes, Your Honor.

12    THE COURT:  Do you understand everything in it?

13    MR. THOMPSON:  Yes, Your Honor.

14    THE COURT:  Do you have any objections to anything in

15 the report?

16    MR. THOMPSON:  No, Your Honor.

17    THE COURT:  The Court accepts the Presentence

18 Investigation Report in each case.

19    MS. STUMP:  May I approach, Your Honor?

20    THE COURT:  Sure.  I want to make my findings with

21 respect to that first.

22    MS. STUMP:  Yes, Your Honor, I apologize.

23    THE COURT:  I find that under the statute in the case

24 ending in 316, the potential for custody is a minimum of five

25 years, maximum of 20 years.  Under the statute in the 273

1  case, the potential for custody is anywhere from probation to

2  30 years.  Supervised release as to each case is a minimum of

3  five years, maximum of life, no eligibility for probation

4  under the statute.  Under each case there is a potential fine

5  of $250,000.  Restitution, to my understanding, is not

6  applicable in this case because it is not going to be sought

7  by the victims from what I read.

8       MS. STUMP:  That's correct, Your Honor.

9       THE COURT:  Special assessment in each case of $100.

10  Under the advisory United States Sentencing Guidelines, given

11  total offense level of 35, criminal history category of three

12  based upon four criminal history points, the guidelines call

13  for recommended advisory range of 210 months to 262 months;

14  supervised release, again in both cases, of five years to

15  life.  Again, no eligibility for probation and potential fine

16  under the guidelines of $20,000 to $200,000.  Again,

17  restitution is not applicable and there is a mandatory $100

18  special assessment per count.  Forfeiture in each case is an

19  IPhone 5, model A1429, serial number ending in 8H2, and a

20  white 2008 Honda Civic, serial number ending in 9451 and a

21  Sony laptop computer, serial number ending in 164.  Any

22  objections to the findings on behalf of the United States?

23       MS. STUMP:  No, Your Honor.  I would amend the

24  forfeiture.  The United States is abandoning seeking the

25  forfeiture of the Honda Civic.  We still remain seeking

1  forfeiture and the defendant has agreed to forfeit the I-phone

2  and Sony laptop computer.

3        THE COURT:  So noted.  So when you get the proposed

4  Final Order of Forfeiture to me, that will be deleted?

5        MS. STUMP:  Yes, Your Honor.

6        THE COURT:  With that understanding, any objections,

7  Mr. Howard?

8        MR. HOWARD:  No, Your Honor, no objection.

9        THE COURT:  All right.  Miss Stump, first of all, how

10  about victim notification?  The victims were notified.  I do

11  have letters from them, which I have certainly read.

12        MS. STUMP:  Yes, Your Honor, thank you.  In Court

13  today present is the minor victim.  For purposes of this

14  proceeding, we wish to identify her as AMC.  She has provided

15  the Court with a victim impact statement signed and presented

16  this morning.  Miss AMC has advised the United States she does

17  not wish to speak to the Court or read her statement in open

18  Court.  Rather, she would prefer that Your Honor reads the

19  impact statement for himself and takes that under

20  consideration.

21        THE COURT:  All right.  I have read it twice, in

22  fact.  Once last night and once when the originals were

23  provided to me today along with a statement from her mother.

24        MS. STUMP:  Yes, Your Honor.  I wanted to make the

25  Court aware of that as well.  Her mother, S.K., is in the

1  courtroom, as well as her father, J. C.  Mr. C has requested

2  permission to address the Court at the appropriate time, if

3  you will let me know, and he would like to make a statement to

4  the Court as well.

5          THE COURT:  Sure.

6          MS. STUMP:  He has not written anything.

7          THE COURT:  Why don't we do it now, and as part of

8  your argument you will have identified that.

9          Mr. C., come forward please.

10          MS. STUMP:  Would you like him to stand here, Your

11  Honor?

12          THE COURT:  Sure.  First of all, welcome to you and

13  your family.  Thank you for attending.  You are free to tell

14  me anything you want me to know.

15          MR. C:  Thank you, Your Honor.  This has taken a big

16  toll on our family.  Excuse me.

17          THE COURT:  I understand.  Take your time.

18          MR. C:  You know, at first we never thought we would

19  see her again.  The impact this has caused on myself, my

20  daughter, our family, her mother, has been something I wish

21  nobody would have to go through.  You know, emotionally my

22  daughter, for the last two years, year and a half, I have seen

23  her go sleepless nights, repeated headaches.  We go to therapy

24  every week.  Again, something I think someone at 16, 17 years

25  old shouldn't have to deal with, shouldn't have to deal with.

1  I have taken hundreds of hours of sick time from work to take

2  my daughter to therapy.  Myself, I have also had sleepless

3  nights over the last year and a half.  It has been a rough

4  road.  She has sisters who also were emotionally affected by

5  this, grandmas, cousins, grandpa.  It just wasn't one person,

6  it was a lot of family and friends who love her.  You know,

7  besides the emotional, the physical part, the financial burden

8  this has cost us.  I feel that at first I was wondering if he

9  even knew the seriousness of this because after he was

10  incarcerated, he continued to call my daughter.  I am not sure

11  if the Court is aware of that.

12          THE COURT:  I know.

13          MR. C:  It just says to me, I don't care, I did what

14  I did, I am going to keep doing it, maybe by telephone, but I

15  am going to keep doing it.  I don't think people like this

16  change.  After 15 years he'll do it again.  That is what they

17  do.  So I hope the sentencing is harsh.  I hope that after he

18  gets out of prison the monitoring is harsh because I pray

19  another family doesn't have to go through what we went

20  through, what my daughter has gone through.  I am just lucky a

21  State Trooper was doing his job running radar one night and

22  pulled them over because I have a feeling we may have never

23  seen her again.

24          THE COURT:  There is no question but that the officer

25  in this case was quite observant and astute.

1    MR. C:  Yes, sir.  Your Honor, that is all I have.  I

2    thank you for your time.

3    THE COURT:  Let me ask you this.  Over time when you

4    look back to when this first happened and how your daughter

5    was doing and how she is doing now, could you tell me what you

6    think?  Is she doing better, is she staying the same, doing

7    worse, ups or downs?

8    MR. C:  She has good days and bad days.  As she gets

9    older she gets more mature, so I think that does help her.

10   But you know, she was a child when this happened.  I

11   definitely think therapy has helped her.  She has developed

12   some kind of bond with her therapist and, you know, over the

13   past year or so she has found a boyfriend who I think --

14   THE COURT:  I was going to ask you, has it had any

15   affect on her relationships with men?

16   MR. C:  I think so, but she does have a boyfriend now

17   who they seem to get along real well, seem to care about each

18   other and I wish nothing but great things from that, you know.

19   THE COURT:  Do you like him?

20   MR. C:  He seems like a nice kid, yes, sir.

21   THE COURT:  As much as a father can like somebody

22   knocking on the door to see his daughter.

23   MR. C:  Obviously my trust issues are hard to deal

24   with, but we just go day by day, sir.  Do I think she is

25   better now than she was a year and a half ago?  Yes, sir, I

1    do.  Do I think she'll be cured ever?  I don't know.  That is

2    for her to deal with and for us to support, but again, this is

3    something that we shouldn't have to go through, you know.  He

4    has affected my daughter, has affected our family and we will

5    be affected the rest of our lives.

6              THE COURT:  How has the family been doing over time

7    outside of your daughter?

8              MR. C:  They seem to do well.  My niece, her cousin,

9    took it real hard.  Her sisters, my younger daughters, didn't

10   know -- don't know a lot.  They just know she was missing and

11   they were very saddened over it, but they are very young so it

12   kind of goes away because they were so young at the time.  But

13   I think as a whole the family has gotten stronger.

14             THE COURT:  Tell me about your daughter now.  Where

15   is she living, what is she doing?

16             MR. C:  She continues to live with myself.  She has

17   been working as a phone operator at a pizza place.  Since this

18   has happened she dropped out of school, out of high school.  I

19   think she had some issues with just trusting people, but since

20   then she has gotten her GED.  We were very -- we really wanted

21   that to happen because we were not sure if she would go back

22   to school.  The next month she'll be moving to South Carolina

23   and hoping to start school down there.  I believe she wants to

24   get away, get a new start, get a fresh start, and her

25   boyfriend is supporting that and he will be there as well.

1          THE COURT:  Okay, thank you.

2          MR. C:  Thank you, sir.  Miss Stump?

3          MS. STUMP:  Thank you.  Your Honor, I checked with

4    Miss K, and she was going to read her letter to the Court, but

5    she has decided she does not want to, she just asks the Court

6    to consider her writing.

7          THE COURT:  I can assure you I have read it.

8          MS. STUMP:  Thank you, Your Honor.  I have provided

9    copies of the letters to the defense as well as probation.

10          The United States is requesting or recommending a

11    sentence of 210 months in the Illinois case, as well as

12    180 months in the Ohio case.  We're asking for the time to run

13    concurrent, for a special assessment as mandated in both cases

14    of $100.  We ask for 15 years of supervised release in both

15    cases to follow imprisonment.  We're asking for a condition I

16    believe the Court has already recognized for registration as a

17    sex offender while on supervised release.  Additionally, we

18    would ask the Court for a term that there be no further

19    contact with AMC.  We would ask that no contact be placed

20    permanently beginning with imprisonment and continuing as a

21    term of supervised release.  Finally, Your Honor, we're asking

22    for a fine in the amount of $4,583.

23          The United States, consistent with the plea agreement

24    in case 13-CR-30273 to which I have been referring to as the

25    Ohio case, at this time asks the Court to dismiss Counts 1, 2

1    and 3 of the Indictment in the Ohio case.

2           THE COURT:  I'll take it under advisement until after

3    I hear arguments of counsel and decide whether to accept or

4    reject the plea agreement.

5           MS. STUMP:  Yes, Your Honor.  Should the Court accept

6    it, we would ask for that as a condition of our agreement in

7    the plea agreement.

8           The justification for the 210-month sentence, Your

9    Honor, is one of looking not just at this offense, which is

10   one I would like to comment on momentarily, but also at the

11   history and characteristics of this defendant and as those

12   played out in the course of this offense.  Of course, these

13   are matters the Court can recognize under 3553(a) factors.

14   The sentence is also one that would punish the defendant and

15   promote respect for the law.  We think it is a just punishment

16   and it would adequately deter others from committing similar

17   conduct.

18          The conduct in this case, after the cross reference,

19   adequately presents to the Court that this is a production

20   case.  Yes, images were brought and transported and that is

21   the crime to which Mr. Thompson pled.  They were transported

22   into our district here in the Southern District of Illinois,

23   but those images were produced based on the defendant's

24   interactions and his requesting them from the victim, his

25   solicitation for them, receiving them.  The Court has seen in

1  the PSR how the defendant asked for shots of the victim's

2  vagina.  The Seventh Circuit has recognized that one who

3  produces or attempts to produce child pornography, that he

4  receives or attempts to receive, is more culpable and more

5  dangerous than one who simply receives it.  That is from

6  *United States v. Dawn*, 129 F.3d 878.  The pinpoint page would

7  be 884 from 1997.  It was recognized by the Eighth Circuit in

8  2010 in *U.S. v. Bauer*.  When you consider, Your Honor, the

9  fact that these images were sent from Ohio to California and

10  the conduct that occurred thereafter, the case becomes one of

11  egregiousness.

12          Defendant's Sentencing Memo discusses his genuine

13  concern or affection that he had for the victim.  The victim

14  was a child.  When the two met, according to the victim, it

15  may have been younger than what Mr. Thompson portrays, but for

16  at least two years they had a relationship online and the

17  defendant clearly knew she was a child and he was clearly an

18  adult, well over the age of 18 at the time.  And when the

19  defendant indicates he felt he had no other choice but to

20  drive across the country, thousands of miles, over 30 hours of

21  driving to go and help the victim, he is making himself out to

22  be a hero when, in fact, he really was a predator on a child.

23  In this case if he genuinely was concerned about the victim,

24  there are no facts that he asked her to speak with her family

25  about the issues she was having and no one would dispute at

1    the time certainly the victim was suffering from some issues

2    and had some concerns about her life at that very moment.  He

3    never -- there are no facts that he asked her to seek a

4    counselor, to talk to anyone, to work out the issues or in any

5    way engage any other human being except for him, a very

6    selfish act.  He also didn't call 911 if he was genuinely

7    concerned about her taking her own life.  He never advised her

8    to call 911.  He took no steps except to suggest that she come

9    stay with him in California and take on a whole new life, a

10   whole new age and turn over this childhood to an adulthood

11   when she was still a child.  Mr. Thompson took advantage of a

12   child when she was vulnerable and I would go so far to say

13   perhaps at her most vulnerable point.  She was very concerned

14   about her life circumstances.  They are discussed.  She was

15   going through an extremely difficult time and he fed on that

16   vulnerability and he set an idea in her head that only she was

17   allowed to know and advised her how she could go without being

18   tracked, she could leave her entire life, her entire family

19   and everything behind if she just went with him.  These are

20   extreme acts, Your Honor, that, again, before he came to Ohio

21   and Illinois, and were continued on or planned to continue on.

22          As the Court knows, Mr. Thompson has an obstruction

23   enhancement.  The conduct under that enhancement demonstrates

24   further how he planned to continue this life to leave a

25   childhood behind and transform a child into an adult by asking

1  her to lie to law enforcement, by asking his family and

2  friends to remove evidence from his home.  All of these acts

3  demonstrate the character of Mr. Thompson at that time.  They

4  are all very selfish.  They are all very concerned and focused

5  on one thing only, Mr. Thompson's personal and perhaps sexual

6  gratification.

7          So, Your Honor, another reason we're asking for the

8  210 sentence, defense mentions that Mr. Thompson's criminal

9  history could be overstated, that the DUI conviction assesses

10  three points to Mr. Thompson for being on probation at the

11  time and for having that offense.  These points, in

12  conjunction with the suspended license, defendant argues,

13  overstate his criminal history category.

14          Even if the Court were to agree with that,

15  fundamentally it demonstrates further about Mr. Thompson's

16  character.  This conviction occurred in 2006 for driving under

17  the influence.  By 2012, Mr. Thompson could not manage to get

18  off of probation for a DUI.  What that means is, probation was

19  continued and continued because he was violating his probation

20  and the violations demonstrate further an extreme disregard.

21          If you set aside all of his conduct involving AMC,

22  which is an extreme disregard for the law, and you look at

23  this conviction, you can further see that the laws mean

24  nothing to Mr. Thompson.  He is truly focused on what it is

25  that pleases him at that moment and even if the Court were to

1  accept the overstated argument and assess one point for the

2  DUI and one point for the suspended license, that would still

3  make Mr. Thompson a Category 2.  The guideline range would be

4  188 to 235 months and sentence of 210 months would be in the

5  middle of that range.

6         Your Honor, based on these factors we're asking the

7  Court for the sentence of 210 months in the Illinois case to

8  run concurrent with the 180 months in the Ohio case, the fine

9  of $4,583, a 15-year supervised release term and, of course,

10  we're asking for the no contact request.

11         I would highlight to Your Honor that as the Court is

12  aware, again, Mr. Thompson was contacting the victim even

13  after this case had begun, even after he knew charges were

14  facing him in Ohio and he was aware of the potential

15  penalties.  He continued to contact a child, again, making

16  things more difficult for her, making, as her letters

17  indicate, life more confusing, and again attacking her at

18  vulnerable times.  Thank you.

19         THE COURT:  How did you arrive at that fine?

20         MS. STUMP:  The fine, if I may, by proffer, and

21  defense counsel can interrupt me if he would like, that was

22  the amount of cash that was recovered from Mr. Thompson's

23  vehicle on the day they were stopped in the Southern District

24  of Illinois.

25         THE COURT:  Okay.

1    MS. STUMP:  That cash belonged to Mr. Thompson.  It

2  was his cash.  He admitted that and he had been using that

3  cash for gas, food and various items while traveling from

4  California to Ohio and back.

5    THE COURT:  Was that seized?

6    MS. STUMP:  Yes, Your Honor, it was seized.

7    THE COURT:  It is in the possession of the

8  Government, but not true forfeiture property?

9    MS. STUMP:  Yes, seized as evidence and currently in

10  the custody of the Collinsville Police Department.  Thank you.

11    THE COURT:  Mr. Howard?

12    MR. HOWARD:  Good morning, Your Honor.

13    THE COURT:  Good morning.

14    MR. HOWARD:  As this Court is aware, under the

15  sentencing statute the Court is to impose a sentence which is

16  sufficient but not greater than necessary to achieve the

17  purposes that are set forth in that statute.  The Court is to

18  make a guideline calculation, but the guidelines are only

19  supposed to be treated as one factor to be considered along

20  with the other factors that are set forth in the sentencing

21  statute.

22    Under *Kimbrough*, the Court can disagree with a

23  guideline as a matter of policy, either categorically in all

24  cases or as that guideline might be applied in a particular

25  case.  With respect to the travel with engaged in illicit

1   sexual conduct charge out of Ohio, I would respectfully urge

2   the Court to accept that plea agreement and impose a sentence

3   of 180 months in accordance with the terms of the agreement.

4   I believe that sentence, and I believe the parties by virtue

5   of the plea agreement, agree that sentence in that case of

6   180 months is sufficient but not greater than necessary to

7   achieve the statutory purposes, and I believe that for the

8   reasons that I am going to talk about with respect to the

9   Illinois case.

10          With respect to the transportation of child

11  pornography charge, we would respectfully ask the Court to

12  vary downward from the guideline range to a concurrent term of

13  180 months and we would also request a period of supervised

14  release of ten years with the conditions that this Court sees

15  fit to attach to that.

16          First of all, as this Court is aware, the guidelines

17  with respect to child pornography are extremely harsh.  In

18  fact, over the course of the last decade they have done

19  nothing but ratchet it up.  The base offense level is almost

20  double what it was when the guideline was originally enacted.

21  There is no question in this case that Mr. Thompson

22  transported images of Miss C when he was traveling from

23  California to Ohio and then when he was ultimately stopped

24  here in Illinois.  He admitted that to the investigating

25  officers before they even did the forensic examination that

1   was conducted on the phone.  There was also no question that

2   he and the victim engaged in sexual intercourse while they

3   were in the State of Indiana.  There is no evidence that he

4   physically coerced her into doing that.  Was he the adult?

5   Yes.  And she was the 16 year old, but I don't believe any law

6   was broken by virtue of the sexual relations that occurred in

7   the State of Indiana.  Obviously at first blush I really think

8   that you can just look at this and say this is just

9   reprehensible conduct.  Is what Mr. Thompson did wrong?

10  Absolutely.  Did he make what I would consider a colossal

11  error in judgment?  There is no question about that.  Does he

12  realize what he did was wrong and does he regret his actions?

13  Is he sorry for what he did?  I think when you hear from

14  Mr. Thompson you are going to find out that absolutely, yes,

15  he realizes what he did was wrong, that he was an adult and

16  Miss C was only 16 years of age.

17          I will say though that based upon my interactions

18  with him throughout the course of this representation and also

19  in the discussions that I have had with his mother, who is

20  here today in the courtroom, I can't help but think that for

21  some reason in his mind, and maybe in a fashion that I don't

22  understand and can hardly wrap my mind around, that he either

23  had or he really believed he had feelings for Miss C.  I mean

24  he told the investigating agents right off the bat in the

25  interview that he loved her and that has come up in some

1   conversations.  So is it hard to grasp?  Yes, but I believe

2   that was part of the factor in what he did.

3        I also think that as a result of the problems that he

4   faced growing up as a child and the divorce and the toll that

5   took on him when his parents divorced, his mom informs me that

6   basically he was diagnosed with depression but he was not just

7   depressed, he was angry and confused about relationships after

8   that.  She believes that David likes to try to save people

9   because this is some reaction to how he was not able to save

10  his own situation as a child growing up or his parents'

11  marriage or to save his mom from what happened.  I do believe

12  that to some degree his interactions with Miss C were the

13  result of him trying to make a situation better because there

14  is no question she was living in the guardianship of her

15  grandparents for some reason or another, and there were

16  troubles going on.  That is set forth in the Presentence

17  Report.  We would ask you to consider those factors.

18       With respect to the criminal history, I would say my

19  Sentencing Memorandum indicated that perhaps the Court could

20  determine that with respect to the conviction for DUI that the

21  amount of points perhaps overrepresents the seriousness of it.

22  If you would do that, you would have the opportunity to

23  determine that category 2 was applicable and then the sentence

24  of 180 months would only be a variance of approximately eight

25  months.

1          I believe a sentence of 180 months definitely sends a

2     loud message of deterrence, not only to Mr. Thompson but to

3     anyone who would have a thought of engaging in this type of

4     conduct or committing these types of acts.  If you do this,

5     you are going to get 15 years and supervised release of an

6     extended period of time, we're asking for ten years, but as

7     much as life.

8          I believe it will provide sufficient protection for

9     the public because Mr. Thompson, although he has been

10    incarcerated for a year, is likely to be incarcerated under a

11    180 months term for another eleven years.  Plus, the Court is

12    going to place him on supervised release with stringent

13    restrictions.  We have reviewed the notice that you sent us of

14    the possibilities and I believe that those type of

15    restrictions will definitely protect the public from any

16    further criminal conduct on behalf of Mr. Thompson.

17         I also think that a sentence of 180 months is enough

18    so that he can receive treatment to help him with the issues

19    that he has that either caused him to engage in this behavior

20    or -- to just engage in this behavior, the type of treatment

21    he can get in the Bureau of Prisons, Your Honor.

22         Lastly, I would like to say that it is a long

23    sentence.  I won't regurgitate it, but in the Sentencing

24    Memorandum I pointed out to the Court, the other types of

25    crimes that one would have to commit in order to receive,

1   after acceptance of responsibility, an offense level of 35,

2   and quite honestly, not to discount anything or the severity

3   of Mr. Thompson's conduct, but I would say that they are

4   equally, if not more severe type of conduct that has even less

5   regard for human life and includes violent behavior.  For

6   those reasons, Your Honor, we would again request that you

7   depart downward to 180 months in the Illinois case and impose

8   the same sentence in the case out of the Southern District of

9   Ohio and impose the period of ten years supervised release.

10  Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Howard.  Mr. Thompson, it

12  is your turn to talk.  Come up to the microphone.  I

13  understand you would like to make a statement.  I am certainly

14  interested in hearing it.

15          MR. THOMPSON:  Uhm, I need to think about what I am

16  going to say for a second.  I guess first off I want to start

17  by apologizing to the C and K family, if that is okay with

18  you.  I am sorry for what I did.  I realize it was wrong.  If

19  I could take it back, I would.  I don't know what else to say

20  really.  It was a horrible thing I did.  I get it.  I am just

21  really sorry and I wish I would have used better judgment.  I

22  wish I would have asked more properly and I just wish I would

23  have made better choices in my life and I am really sorry for

24  the way it is affecting you and your family emotionally.  I

25  think that is it.  If there is any way at all that I could

1  help any of you move on emotionally, I would love the

2  opportunity to be of any help that I can be, even though I

3  doubt I can, but I just want to let you know that if there is

4  anything I can do at all to help you and your family move on,

5  I would be more than willing to do it.  I am very sorry.

6         That said, I know what I did was wrong and I just --

7  I don't know, I had a lot of things I wanted to say but I

8  can't really remember them right now.

9         THE COURT:  I am happy to take a break if you want to

10  gather your thoughts, take some notes.  This is your time.

11         MR. THOMPSON:  I have some notes with me.  I just was

12  trying to speak more from the heart I guess.

13         THE COURT:  Well, it is not uncommon for individuals,

14  because they are nervous, to read their notes to me.  That is

15  fine.

16         MR. THOMPSON:  All right, I am going to refer to it.

17  I don't want to read it directly, but --

18         THE COURT:  If it will help you jog your memory, feel

19  free to refer to them.

20         MR. THOMPSON:  I just really want to point out that

21  going forward I am going to make better choices.  I have to.

22  I mean I am an adult and I need to be responsible and make

23  better choices and learn from my mistakes and this is an

24  extremely long prison sentence and it is going to give me a

25  lot of time to I guess figure out -- this is really upsetting

1  for me as well.

2      THE COURT:  I understand.

3      MR. THOMPSON:  Just being away from my family has

4  really made me realize how important they are to me and how

5  much they love me.  With my mom being here, it is unbelievable

6  the support and love that she showed me.  And I just really

7  would like to get back to my family and spend as much time

8  with them as I can while they are still around and that is why

9  I don't know, I am really not doing well right now.

10     THE COURT:  You are doing fine.

11     MR. THOMPSON:  I just want to beg for the mercy of

12 the Court and, you know, in the form of a shorter prison

13 sentence so I can get back to being with my mom and spend time

14 with my family and try to make up for the heartbreak and pain

15 I have caused my own family.  And I don't know what to say.  I

16 feel terrible about all of this.  I just wish I wouldn't have

17 done it.  I wish I would have made better choices.  I don't

18 know.  I had -- really deep down I feel like I did have good

19 intentions.  I just really screwed up and went about trying to

20 help someone the wrong way.

21     THE COURT:  I know that is your position, but this is

22 -- Your relationship began online.  This was a 14-year old

23 girl.  When you had sex with her, which apparently is not

24 illegal in Indiana, she is 16.  You might have loved her, but

25 she was not capable of loving you back.

1          MR. THOMPSON:  I realize that now.

2          THE COURT:  She was an impressionable, vulnerable,

3     young teenage girl who was probably infatuated and wanted to

4     change whatever circumstance she was in.  You recognize that

5     now, don't you?

6          MR. THOMPSON:  Yes.

7          THE COURT:  Okay, go ahead and have a seat.

8          The Court sentences under a law or statute known as

9     18, United States Code, Section 3553.  That requires me to

10    impose a sentence that is sufficient but no greater than

11    necessary to comply with the four purposes of sentencing in

12    Federal Court.  They are the need for the sentence imposed,

13    number one, to reflect the seriousness of the offense, promote

14    respect for the law and provide just punishment for the

15    offense; second, to afford adequate deterrence to criminal

16    conduct; third, to protect the public from further crimes of

17    the defendant; and lastly, to provide him with any needed

18    educational or vocational training, medical care or other

19    correctional treatment in the most effective manner.

20         In doing that, I consider the kinds of sentences

21    available.  I endeavor to avoid unwarranted sentencing

22    disparities among defendants with similar records found guilty

23    of similar conduct.  In doing all of that, I consider the

24    nature and circumstances of the offense and the history and

25    characteristics of the defendant.  I am going to touch on some

1  of those factors today, but if at the conclusion either side,

2  Government or defense counsel, wants me to expand on any one

3  or more, or if you don't feel that I have touched on

4  mitigation adequately, Mr. Howard, let me know and I will

5  gladly expand on one or more of those factors, including

6  mitigation.  If you don't ask me to expand, I am going to

7  assume that my explanation is both factually and legally

8  sufficient.

9      Before the Court is a 26-year old man who traveled

10  from California to Ohio to pick up a 16-year old female.  They

11  communicated via chat, cell phone, text messaging, Skype,

12  Facebook and Facebook instant messaging on and off for about

13  two years.  The defendant traveled with an I-phone cellular

14  telephone that contained pictures of the victim engaged in

15  sexually explicit poses.  In addition, the two engaged in

16  sexual relations in the State of Indiana, which is not a

17  criminal offense.

18      I have given the procedural history of the case.  I

19  note from the Defendant's Sentencing Memorandum that

20  Mr. Thompson and AMC discussed many things during their

21  communications, including AMC's family situation, living with

22  her grandparents as guardians.  They discussed music, pets,

23  AMC's schooling, relationships, sex and their ages.  They

24  celebrated birthdays together online and they knew,

25  importantly, each others true ages.

1          During the relationship, Mr. Thompson and AMC

2    discussed her moving to California when she completed high

3    school.  In roughly 2012, AMC, according to defense counsel,

4    was threatened by her grandparent guardians with being placed

5    in a foster home.  AMC told Mr. Thompson she would rather kill

6    herself than go into a foster home.

7          His position was he decided sometime between

8    September 23 of 2012 and October 22 of 2012 he would drive

9    from California to Ohio to pick her up so they could live

10   together.  He told investigating agents he went to Ohio to

11   pick up AMC because he thought AMC was going to hurt herself.

12         He picked her up on October 22 of 2012.  They drove

13   to Mr. Thompson's cousin's house in Indiana where they spent

14   the night and engaged in sexual intercourse.  The next day

15   they left on for California.  On October 23 of 2012, the

16   Illinois State Police initiated a traffic stop on the vehicle

17   being driven by Mr. Thompson.  The trooper approached the

18   vehicle, the defendant admitted speeding and the trooper

19   observed AMC sitting in the front passenger seat and when

20   asked for identification, she didn't have any.  When asked for

21   her date of birth, she said "Whatever makes me 18" in response

22   to their request for the year she was born.  She eventually

23   admitted she was 16 years old.  Mr. Thompson was detained

24   pending further investigation.  The record check indicated

25   that she was -- her true identity, she had been reported

1    missing and endangered from Ohio.

2          In August of 2012 AMC sent pictures of her vagina and

3    breasts to Mr. Thompson via cellular phone.  Mr. Thompson

4    saved those on his cell phone.  He also sent photographs of

5    his penis to her via cell phone.  When he traveled from

6    California to Ohio and later into Illinois with the I-phone,

7    he admitted that he knew the I-phone contained these images.

8          In terms of the Ohio case, which is 13-CR-30273, the

9    Court believes that the plea agreement by and between the

10   parties under Rule 11(c)(1)(C) should be accepted by the Court

11   in that nothing in that plea agreement is consistent with the

12   Court's obligations under 18, U.S.C. Section 3553.  So in the

13   Ohio case, the defendant is sentenced to a term of 180 months

14   of incarceration.

15         I am going to take a break until about 10:15 and come

16   back and make my conclusions with respect to the Illinois

17   case.  Court is in recess.

18     (Whereupon a recess was taken.  The following proceedings

19   were held in open Court.)

20         THE COURT:  Okay, please be seated.

21         Just a few general comments.  These cases are always

22   difficult for everybody.  Mr. Howard points out the harshness

23   of the child pornography guidelines and I have been on record

24   saying that the possession guidelines are harsh because given

25   the Congressional mandated enhancements, it is very unusual

1    for an individual to not come very close to the ten year

2    mandatory minimum in a possession case.  This is not a

3    possession case.

4         I have also said many times that sentencing in

5    possession of child pornography cases, which this is not, is

6    extraordinarily difficult for me because I simply don't

7    understand the crime.  I don't understand what would possess,

8    what is 99 percent of the time, a crime involving a man to

9    become aroused by looking at pictures of infants, toddlers and

10   children.  So it is particularly difficult for me to sentence

11   a crime that I don't understand.

12        This case is, however, different.  I think I

13   understand this case.  I understand this crime.  The Ohio case

14   for which I imposed a sentence of 180 months, for which I now

15   dismiss with prejudice Counts 1, 2 and 3, by agreement, in

16   it's bare terms, while serious, may not be as serious as the

17   Illinois case to the extent the Illinois case involved the

18   production, the transportation of this child pornography.

19   Both extraordinarily serious offenses, no question about it.

20        These cases are difficult because we have true

21   victims, unlike a drug case where we have the victim is the

22   United States of America or society in general.  Here we have

23   a living, breathing human being victim and family on one side,

24   and on the other side we have an individual defendant, living,

25   breathing, with a parent who is here, who, by all accounts,

1   was an extraordinary mother, did what she could and ought to

2   have no regrets over anything she did or didn't do in this

3   case.

4        My role is to sentence consistent with the law in a

5   dispassionate, reasoned manner.  If I were the father of the

6   defendant in this case, I would want him to get probation.  If

7   I were the father of the victim in this case, I would want him

8   to get 50 years, in other words, the maximum.  My role is to

9   be a reasoned, dispassionate arbiter in this matter.  There is

10  no sentence that I am going to hand out today that is going to

11  make anyone happy.  One side is going to think it is too

12  lenient, one side is going to think it is too harsh no matter

13  what I do unless I give him probation or unless I give him 50

14  years, which will not be the case.

15       I am going to start with the terms of supervised

16  release.  I am going to impose all of the terms and conditions

17  of supervised release I alerted the parties to at document 7

18  in the 273 case e-filed on December 19th, and those same terms

19  and conditions will be imposed in the Ohio case.

20       In terms of the length of supervised release, Mr. C's

21  statement to me is they'll do it again.  The fact is, we don't

22  know with respect to sex offenses if individuals are going to

23  recidivate or not.  There is just not good data and the social

24  sciences just aren't mature enough to tell us.  Because of

25  that and because of the fact that this was, in my view, a

1    "hands on offense" and by that I mean this isn't a possession

2    offense where he picked up these photographs off the internet.

3    This is one where he encouraged the photographs to be taken

4    and accepted them and I am concerned about him in the future

5    with the possibility of reoffending.  I am concerned perhaps

6    over the two year period prior to meeting the victim he may

7    have been grooming her, and understanding that a term of

8    supervised release can be reduced but can't be extended, I am

9    going to place him on a lifetime of supervised release with

10   all of the terms and conditions I alerted everyone to.

11          That includes mandatory sex offender reporting, and I

12   know I went over this with you, Mr. Thompson, but you are

13   going to have to report in every jurisdiction where you live.

14   That might be federal, state, county and city, and most

15   recently there was a case that indicates if any of the

16   jurisdictions charge a fee for registering, you'll have to pay

17   that.  That, I understand, is a very long term of supervised

18   release given your age, but I think in this case it is

19   necessary in order to protect the public from the potential of

20   other crimes you may commit and because we simply don't know

21   whether or not you are likely to recidivate or not, and with

22   the further understanding that if, after a period of time, you

23   have been able to comport your conduct with the requirements

24   of a civilized society, that term of supervised release can be

25   not only reduced, but you could be released early from

1   supervised release at sometime in the future.

2           With respect to the criminal history in this case, it

3   is outlined in the Presentence Report in page 9, I do note

4   that there is an arrest at paragraph 51, or not 51, paragraph

5   59.  It is my habit to not consider arrests as part of the

6   sentence.  If there are multiple arrests by multiple

7   jurisdictions over multiple time frames, I might think there

8   is a pattern.  I don't have that before me, so I don't

9   consider the conduct in paragraph 59 in imposing the sentence

10  in this case.  I do consider it to the extent that I think it

11  supports my belief that there ought to be cyber search

12  monitoring as I indicated in the terms and conditions of

13  supervised release, because he did meet that individual on

14  line and that, apparently, is not contested.

15          We have in Federal Court sentencings according to the

16  guidelines in an advisory capacity, and sentencing basically

17  is driven by the seriousness of the offense and the criminal

18  history of the defendant.  In this case the defendant has been

19  charged with a total of 4 criminal history points, putting him

20  in criminal history category of 3.  Those points barely put

21  him in category 3.  In order to get to category 3, you need to

22  have four, five or six points, so had he had one less point,

23  he would be in category 2, but the fact is he does have 4

24  points so he is in category 3.

25          The difference between category 3 and category 2 at

1  his level is the difference is in category 2 the advisory

2  guideline sentence is 188 to 235 months, and a criminal

3  history category of 3 is 210 to 262 months. Those four points

4  are arrived at based upon a 2006 DUI in Riverside County. He

5  pled guilty, was sentenced to 15 days in jail, placed on

6  summary probation for 36 months in order to pay a fine and

7  assessment. Under the guidelines, he received one point for

8  that.

9        He was terribly unsuccessful on summary probation

10  because he was sentenced to ten days in jail for violating

11  after that. His probation was revoked once again after that.

12  Again another probation violation, sentenced to 13 days in

13  jail. Again probation was revoked, sentenced to 15 days in

14  jail. Clearly he did not do well on the summary probation.

15  He then picked up another point for CDL suspended, which I am

16  assuming means he had a commercial driver's license.

17        MR. THOMPSON: CDL is California driver's license.

18        THE COURT: So you were driving without a license

19  over the suspended license?

20        MR. THOMPSON: Yes, I had temporary license and it

21  was a day after it expired. I was not aware of it.

22        THE COURT: Okay. So you catch another point for

23  that.

24        Then because you were on probation and DUI at the

25  time of this offense before me occurred, you pick up two more

1   points, so that is how you get four points.

2          Without deprecating the seriousness of this criminal

3   history, I think it over represents the defendant's

4   criminality by assessing him at Category 3, so I am going to

5   depart downward to Category 2.  That is the 188 to 235

6   advisory range.

7          Now some specific comments regarding the guidelines

8   and the nature and circumstances of the offense.  This

9   particular offense has had adverse consequences to the victim

10  and her family that may well be long lasting or permanent.  I

11  am encouraged that she seems to be doing better.  I am

12  encouraged that she has been able to develop a relationship

13  with a man.  I am encouraged that she is moving on and moving

14  away and has plans.  I am glad the family has sought and is

15  still undergoing what appears to be significant therapy on a

16  weekly basis.  This offense has had and will have in the

17  future collateral damage.  In the past there has been hundreds

18  of hours of sleeplessness, hundreds of hours of time lost by

19  the victim, collateral damage to the victim, family financial

20  burdens, and so it had a significant impact on people.

21         The sentence must be significant enough to deter

22  individuals, to reflect the seriousness of the offense,

23  promote respect for the law and provide just punishment.  This

24  is an offense that, but for a very vigilant state trooper, may

25  well have resulted in the victim's family never seeing her

1  again.  I can't imagine, having raised four children myself,

2  what it is like to not know where your child is for this time

3  frame.  When my kids were a minute late after curfew I was at

4  the door, I had my finger on the telephone wondering should I

5  call the police.  This was before.  I understand the anguish.

6          On the other hand, I understand the defendant and

7  what can only be described, in my view, as a warped view, may

8  have thought he was truly in love with this woman.  That is

9  painting this picture in the light most favorable to him.  In

10  the light most unfavorable, he groomed her for two years, took

11  advantage of her and he has claimed he was trying to save her

12  from suicide in the throes of her grandparent's protection.

13  This is very much a case akin to the production of child

14  pornography.  It is not charged as that, but the bare facts

15  really seem to support that.  Of course, that is, in my view,

16  the most egregious crime in the child sexual offense arena,

17  but he is not charged with that.  He didn't plead guilty to

18  that, but there is no doubt in my mind but that he did

19  encourage her to send the photographs.  He accepted them, sent

20  photographs back to her and that is serious.

21          What is particularly serious also in my view is, as

22  someone who, on a daily basis, tries to make fair and

23  impartial decisions based upon honest under oath testimony, is

24  the obstruction of justice.  This system doesn't work when

25  people lie under oath.  This system doesn't work when people

1  hide evidence, encourage people to hide evidence or have

2  evidence destroyed, and evidence was destroyed in this case

3  and there was a concentrated effort to have evidence hidden in

4  this case.  That, of course, has been taken into consideration

5  by the guidelines.

6       Was that obstruction of justice known in the Ohio

7  case when the plea agreement was negotiated.

8       MS. STUMP:  Your Honor, I don't know.  The United

9  States from this District, unfortunately, was not a party to

10 those negotiations or is aware of them whatsoever.  I believe

11 Mr. Howard would say the same, that that plea agreement was

12 negotiated between Mr. Monahan, Smith Monahan, defense

13 attorney there, and Miss Chrissy Muncy, the AUSA assigned to

14 the matter in the Southern District of Ohio.

15       THE COURT:  Mr. Howard, do you know?

16       MR. HOWARD:  To be honest with you, sir, I do not,

17 although they had negotiated that for quite some while, but

18 were they or were they not given copies or provided discovery

19 from the case?  If they were provided discovery from this

20 case, yes, they had to know it because it was in there.

21       THE COURT:  Okay.  Under the rule of lenity and to

22 the benefit of the defendant, I am going to presume as part of

23 that case and its negotiations, the obstruction was known to

24 the Ohio officials when that plea agreement was negotiated.

25       MS. STUMP:  Your Honor, so you know, the United

States did, and that would be me, my office, did provide
copies of at least the jail calls to the Southern District of
Ohio U.S. Attorney's office, so those jail calls, that portion
would have been provided as well as Trooper Herd's police
reports, ISP reports, indicating that the statements from Miss
C as to, you know, whatever would make me 18, those were
included in our PSR as facts supporting the obstruction.

THE COURT:  So they probably were aware of the
potentially obstructive conduct.

In terms of the history and characteristics of the
defendant, as defense counsel points out in his memorandum,
Mr. Thompson understands that he has been convicted of two
serious offenses.  He has pled guilty in a timely fashion and
admitted his relevant conduct.  He understands that his
involvement with AMC was "a colossal error in judgment" and
that it has seriously and permanently impacted AMC, her mother
and father and family, as well as Mr. Thompson's family.

He was born on January 26th of 1987 in Orange,
California.  He described his childhood as standard, noting
that all of his needs were met.  He recalls that his father
was hard on him and emotionally and verbally abusive, however,
he has a "great mom" who has always been there for him.
During his formative years he was advised his parents were
divorced when he was 12 years old.  He suffers from some
anxiety and suffered depression since the seventh grade when

his parents were divorced.  He has used medical marijuana

since the age of 21.  As I indicated, his three points

associated with his 2006 driving under the influence

conviction does overstate the severity of the conviction.

I must provide just punishment for the offense.  I

note the defendant is 26 years old.  People need to understand

in Federal Court when someone is sentenced to life, it is

life.  When someone is sentenced to a term of months of

incarceration, because we want them to improve themselves

while incarcerated, because we want to encourage them to do

better, because we want to mitigate any effort to lash out at

the guards or other inmates, we give them credit for good

time.  That is completely up to the Bureau of Prisons, so if

someone is sentenced to a term of imprisonment in the Bureau

of Prisons and they comport their conduct with the rules, they

can get up to 15 percent of their sentence reduced.  No more

than that though.  So any sentence I impose would require the

defendant to complete 85 percent of that.

So the sentence to a 26 year old of 180 months in the

Ohio case is significant by itself.  It is particularly

important that this sentence deter other individuals.  I try

to make any sentences comport with 3553, but they must also

send a message of deterrence.  Frankly, I don't know how the

deterrence gets out.  Maybe through press releases, maybe the

word gets out, but deterrence has two forms.  There is general

1   societal deterrence, and that is the result of a significant

2   sentence that causes people to sit back and say wow, that is a

3   long sentence, perhaps I ought not engage in that.

4         Then there is individual deterrence, and that would

5   be a sentence that would deter Mr. Thompson in the future from

6   committing further crimes.  In other words, it has to be

7   significant enough and harsh enough to do so, while at the

8   same time it can't be any greater than necessary to do so

9   under 3553.

10        While I understand the guidelines are advisory, there

11  is a little tension between them being advisory and my

12  requirements under 3553 of having to avoid unwarranted

13  sentencing disparities among defendants with similar records

14  who have been found guilty of similar conduct.  As such, when

15  confronted with a unique case, and I am not suggesting not

16  every case is unique, but this one is certainly different than

17  any I encountered in the past.

18        I handle a lot of drug and gun cases, and although

19  the defendant's sentences are tailored in each of the cases,

20  they oftentimes have a very similar fact pattern.  This is a

21  fact pattern I have not confronted before.  To that extent, I

22  give a little greater weight to the guidelines than I would if

23  I were sentencing, for example, in a gun case, which I do

24  probably two or three times a week and have done so for the

25  past 13 years.

1        The sentence must also provide just punishment for

2   the offense but be no greater than that to do so as well as

3   protect the public from further crimes of the defendant.  He

4   has a relatively limited criminal history, although he did

5   horrible on probation when he was on probation after the DUI,

6   but has a relatively limited criminal history that teaches us

7   that he is probably unlikely to recidivate, but then again, he

8   commits this very reprehensible offense in Ohio and in

9   Illinois, so I can't really conclude whether he is likely to

10  recidivate or not.  That is why I have imposed a lifetime of

11  supervised release so we can closely monitor him.  Once he is

12  released from custody, he'll have to report to probation

13  minimally once a month.  He'll be drug tested.  He'll have to

14  comply with all of our rules and regulations, and if he fails

15  and it is serious enough, he will be sent back for additional

16  imprisonment for violating the Court order of supervised

17  release.

18        After considering all of the factors in 18 U.S.C.

19  Section 3553(a), the Court imposes a sentence in the Ohio

20  case, 13-CR-30273, in the amount of 180 months, and in the

21  Illinois case, 12-CR-30316, at the midpoint of the guidelines

22  of 210 months, the two cases to run concurrent with each other

23  and not consecutive.

24        Again, I impose all terms and conditions of

25  supervised release that I alerted the parties to with the

1  following additional special conditions:  Mr. Thompson, you

2  asked the C family if there is anything you could do to help

3  them move on emotionally, you would be willing to do it.  The

4  answer to that comes from me and that is to just stay away

5  from all of them.  I am ordering that for life.  You have no

6  further contact with AMC or her family, either directly or

7  indirectly.  If through some strange twist, what I would refer

8  to as a contorted twist, any one of them wants to contact you,

9  they will have to go through the Probation Department and

10  contact will be made that way or through the U.S. Attorney's

11  office in Ohio.  Actually, through here, because the case is

12  being handled here.  Otherwise, no contact directly or

13  indirectly; no letters, no phone calls, no having any family

14  friends or friend of yours contact them through a third party.

15  Nothing whatsoever.  I would consider a violation of that to

16  be extraordinarily egregious and would insist that Petition to

17  Revoke Supervised Release be filed irrespective of any other

18  violations in this case should that happen.

19         Does the Government request any further -- by the

20  way, as part of this sentence I certainly considered the

21  letters from the victims in this case, arguments of counsel,

22  Presentence Report, the defendant's statement in allocution.

23  Does the Government request any further amplification of 3553?

24         MS. STUMP:  No, Your Honor.  I apologize if this is

25  premature.  We had not addressed a fine.

1        THE COURT:  I am sorry, I missed that.  I wanted to

2    know your position about the $4,583 fine.

3        MR. HOWARD:  Well, Your Honor, in light of the

4    sentence, obviously, you have the discretion to impose a fine

5    up to the statutory maximum.  In light of the sentence and

6    everything and the fact that Mr. Thompson has been

7    incarcerated since October of 2012, I would suggest that he

8    really doesn't have the ability to pay a fine and would ask

9    the Court to waive any fine in this case.

10       THE COURT:  Okay.  The guidelines call for a fine of

11   20,000 to 200,000.  He doesn't have the ability to pay a fine

12   in the guideline range.  Having reviewed his financial

13   statement, he is underwater and negative.  There is, however,

14   according to my understanding, a corpus of $4,583 in

15   possession of law enforcement officers.  I believe that would

16   be an appropriate fine in this case, so that will be the fine.

17   Having assessed his ability to pay, he'll pay his total --

18   Actually, what I want to do is make his fine $4,483 and have

19   the additional $100 applied toward his special assessment.

20   Actually, it is $200.  So the fine will be $4,383 and $200

21   special assessment and financially his slate is clean.  He

22   doesn't have to worry about any of that from incarceration on

23   to supervised release.  Additionally, there will be a

24   forfeiture of the personal things that I discussed, but not

25   the Honda Civic.  I think that covers everything, supervised

1 release, incarceration on both cases, fine, special

2 assessment.  Did I miss anything?

3         MS. STUMP:  No, Your Honor.  Thank you.

4         THE COURT:  Mr. Howard, any further amplification

5 requested or mitigating circumstances or 3553?

6         MR. HOWARD:  No, Your Honor.

7         THE COURT:  Mr. Thompson, you have a right to appeal

8 your sentence in this case and your conviction, somewhat.  The

9 reason I say that is your plea agreement in Ohio clearly

10 provides that if I accepted the plea agreement of 180 months,

11 you give up your right to appeal as long as I didn't sentence

12 you to more than the statutory maximum, which I did not, so I

13 think you have given up your right to appeal the Ohio case.

14 If you think that language doesn't apply to you, you can

15 present that theory to the Court of Appeals and appeal the

16 Ohio case.  That will be appealed here in Illinois and

17 Mr. Howard will explain it to you.

18         With respect to the Illinois case, 12-CR-30316, you

19 have not given up or waived your rights of appeal.  So let me

20 tell you what they are.  You can appeal your sentence and

21 conviction in this case if you want to do so.  You must file

22 your Notice of Appeal within 14 days of me entering judgment

23 in your case, or your rights of appeal are gone forever.  If

24 you can't afford an attorney to handle the appeal for you,

25 Mr. Howard will continue at no charge unless and until he is

1  relieved of his obligations by the Court of Appeals, at which

2  time they would appoint a substitute attorney to represent

3  you.  The Court of Appeals charges a filing and docketing fee,

4  which total $505.  If you can't afford that, I will waive that

5  fee and your appeal can proceed forward at no charge.  The

6  court reporter would have to prepare the transcript of the

7  proceedings of everything that occurred in your case and not

8  only here, but in Ohio, should you choose to appeal that case.

9  If you can't afford the charge for those services, I will have

10  the transcripts in both cases or whichever case you choose to

11  appeal prepared for you at no charge.  Do you understand your

12  rights of appeal?

13         MR. THOMPSON:  Yes, Your Honor.

14         THE COURT:  Take a moment and speak to Mr. Howard

15  confidentially.  If you want me to file a Notice of Appeal for

16  you in either case or both cases, I will, but you have to ask

17  me to do that now.  Then I will file Notice of Appeal when I

18  enter judgment, otherwise, you can ask Mr. Howard to appeal

19  for you in the future, bearing in mind the 14 day limitation,

20  or you can choose not to appeal at all.

21         MR. HOWARD:  He does not want the Court to file.  If

22  he decides that he wishes to appeal the sentence, he is going

23  to get in touch with me.  I'll go down and meet with him again

24  to make sure he knows it has to be within 14 days.

25         THE COURT:  As an aside to that, Mr. Thompson, you

1  can't call Mr. Howard on the thirteenth day and twenty third

2  hour and expect him to get it on file.  I know he is going to

3  talk to you today.  The other thing is I don't know if he can

4  accept collect calls or not.  Some people can't accept them,

5  like the public defender, so people that want to appeal on the

6  thirteenth day can't get ahold of their lawyer.  Talk to him

7  today and he'll advise you.  Any questions at all?

8         MR. THOMPSON:  No.

9         THE COURT:  Anything else from the Government?

10        MS. STUMP:  No, thank you, Your Honor.

11        THE COURT:  Okay.  You know, just as an aside, I used

12  to sentence on Mondays and the reason I changed is my wife

13  said to me, you know, you are always in a lousy mood on

14  Saturday and Sunday because you are preparing for these

15  things.  Why don't you do it on Friday and that way you are in

16  lousy mood on Wednesday and Thursday and I don't have to deal

17  with you.  I tell you that because I don't relish doing this

18  today.  I can only tell you I understand that I am in a better

19  position than either side here.    (Court is adjourned.)

20        I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22  SS/Barbara Kniepmann                    March 18, 2014

23

24

25